IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
NOVEMBER 28, 2006 Session

# DAVID PREWITT v. SEMMES-MURPHEY CLINIC, P.C., ET AL.

Direct Appeal from the Circuit Court for Shelby County
No. CT-000235-03-3     Karen R. Williams, Judge

_____

No. W2006-00556-COA-R3-CV - Filed March 23, 2007

_____

The plaintiff was rendered a quadriplegic after a car accident, and he received care at The Regional Medical Center at Memphis. The hospital staff included University of Tennessee School of Medicine residents, private physicians who were dual employees of a private corporation and the University of Tennessee as part of its residency training program, and nurses employed by another private corporation. The dual employee physicians treated patients independently in their capacity as employees of the private corporation and supervised resident physicians in their capacity as employees of the University of Tennessee. A University of Tennessee resident physician intended to perform a lumbar puncture procedure on the plaintiff, and he left a written request for a nurse for a lumbar puncture kit for said procedure. The nurse provided this kit, but did not include an antiseptic. The day of the procedure, the resident physician lowered the plaintiff's bed rail and placed the plaintiff on his side in anticipation of performing the lumbar puncture, but when he noticed that an antiseptic was missing from the kit, he briefly left the plaintiff unattended to obtain the antiseptic. When the resident physician returned to the room, the plaintiff had fallen off the bed onto the floor. The plaintiff ruptured his spleen from the fall, requiring major surgery which resulted in subsequent complications. The plaintiff filed suit in both the Tennessee Claims Commission and the circuit court against the resident, the University, the hospital, the nurse, and the present corporate defendants, alleging claims of medical malpractice and negligent supervision. The liability of the resident and the University was stipulated by the parties in the Claims Commission, and these parties were dismissed from the circuit court proceeding on the basis of immunity. The present defendant corporations remained in the circuit court action. After discovery, the plaintiff moved for summary judgment in the circuit court. The defendant physicians' corporation moved for summary judgment based upon immunity and the plaintiff's lack of expert testimony, and the defendant nurse's corporation moved for summary judgment based upon the plaintiff's lack of expert testimony. The trial court granted both defendants' motions for summary judgment and certified the judgments as final. The plaintiff filed a timely notice of appeal to this Court. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Gary K. Morrell, Memphis, TN, for Appellant

Albert C. Harvey, Marcy L. Dodds, Memphis, TN, for Appellee, Semmes-Murphey Clinic

W. Lee Maddux, T. Ryan Malone, Chattanooga, TN, for Appellees, Kindred Pulmonary Unit, Kindred Healthcare Services, Inc., Kindred Hospital-Chattanooga and Marcia Glover, R.N.

**OPINION**

**I. FACTS AND PROCEDURAL HISTORY**

This is an appeal from a medical malpractice case in which the trial court granted the defendants' motions for summary judgment. The plaintiff's pre-existing medical condition of quadriplegia is not disputed, nor are the substantive facts related to how the plaintiff's subsequent injury occurred. On April 30, 2002, the plaintiff, David Prewitt ("Plaintiff" or "Appellant"), was involved in an automobile accident on Interstate 55 in Mississippi. After being transported by ambulance to a Mississippi hospital, he was airlifted to The Regional Medical Center at Memphis ("The Med") where his severe spinal injuries were treated in the Trauma Intensive Care Unit by numerous medical providers. Mr. Prewitt was eventually diagnosed with quadriplegia and paralysis.

On June 8, 2002, Mr. Prewitt was transferred to the Kindred Pulmonary Unit at The Med. On June 17, 2002, Dr. Kelly Scrantz, a neurosurgery resident physician at the University of Tennessee School of Medicine ("UT"), performed a lumbar puncture procedure on Plaintiff while being supervised by a senior UT resident, Dr. Banergee. This nonsurgical invasive procedure was performed without incident. Dr. Scrantz scheduled a repetition of this procedure four days later. On the morning of June 21, 2002, Dr. Scrantz left the following written order for the nursing staff in preparation for a second lumbar puncture on Appellant: "Lumbar Drain kit to bedside[.] Lumbar Puncture kit to bedside[.] box 4 x 4[.] #7 sterile gloves[.]" Nurse Marcia Glover signed off on this order at approximately 10:45 A.M., and she put the requested items in Mr. Prewitt's room sometime prior to the procedure.

At approximately 3:15 P.M. that afternoon, Dr. Scrantz entered Mr. Prewitt's room to perform the lumbar puncture procedure. Dr. Scrantz lowered Appellant's bed rails on the side where he would be working during the procedure and positioned the patient on his side against the bed rails on the opposite side. Dr. Scrantz placed the items provided by Nurse Glover on the bed, and he noticed that Betadine, an antiseptic, was not present. Dr. Scrantz immediately left the room and began walking to the supply closet, where he located and obtained a bottle of Betadine. Dr. Scrantz

-2-

walked back toward Mr. Prewitt's room, and as he approached it, he saw that Mr. Prewitt had fallen onto the floor, and that two hospital staff members had come into the room, one of whom was Nurse Glover, who had heard the patient fall from his bed. Mr. Prewitt was bleeding from his forehead and appeared to be in pain, and he was placed back onto the bed. A CAT scan was performed on Mr. Prewitt, and his condition later worsened, as he went into shock and became hypotensive and unresponsive. Mr. Pruitt's spleen had ruptured during the fall, causing internal hemorrhaging, and he required a blood transfusion and resuscitation. Mr. Prewitt underwent emergency surgery to remove his spleen, during which a necrotic gall bladder was also discovered and removed.[1]

On December 27, 2002, Plaintiff filed a complaint in the Tennessee Claims Commission alleging negligence by the UT resident, Dr. Scrantz. Plaintiff also filed a complaint on January 15, 2003 in the Shelby County Circuit Court against The Med and Dr. Scrantz. Plaintiff later amended the circuit court complaint to add Semmes-Murphey Clinic, P.C. and Semmes-Murphey Neurologic & Spine Institute ("Semmes-Murphey"); Kindred Pulmonary Unit, Memphis; Kindred Healthcare, Inc.; Kindred Hospital – Chattanooga ("Kindred"); Nurse Glover, and Nurse Dana Avant,[2] Nurse Glover's supervisor, as defendants. Plaintiff's claim against Semmes-Murphey was based upon the allegations that Dr. Shelly Timmons and Dr. Michael Muhlbauer, who were employed by both Semmes-Murphey as private physicians and by UT as supervising faculty for the residency program, had failed to properly supervise the resident Dr. Scrantz during the attempted lumbar puncture on June 21, 2002, and that these defendants acted within the scope of their agency and employment by Semmes-Murphy.[3] Plaintiff alleged that Nurse Glover was negligent by leaving him unattended and failing to procure the supplies necessary for the lumbar puncture procedure, and that she acted within the scope of her agency and employment by Kindred. Semmes-Murphey filed an answer in which it admitted that Dr. Scrantz was a resident physician employed by the State of Tennessee, denied that Semmes-Murphey, Dr. Timmons, or Dr. Muhlbauer had employed or otherwise acted as the principal for Dr. Scrantz under the circumstances giving rise to Plaintiff's cause of action, and alleged several affirmative defenses. Kindred and The Med also filed answers denying liability and

---

[1] As a result of the operation, Plaintiff further alleges that he "sustained severe abdominal disfigurement and a large ventral hernia" which still have not healed.

[2] Plaintiff voluntarily dismissed Nurse Avant from the action on March 10, 2006.

[3] The affiliation agreement between The University of Tennessee School of Medicine and The Semmes-Murphey Clinic characterizes the nature of the relationship between the two entities as follows:

> The College of Medicine, University of Tennessee, Memphis (UT Memphis), and the Semmes-Murphey Clinic (SMC) have had a close and productive relationship in the neurological and neurosurgical disciplines for many years. UT Memphis and the SMC understand that the existence of a strong Department of Neurosurgery in the College of Medicine (COM) enhances the overall excellence of SMC, UT Memphis and the Memphis Medical Center. With the realization that outstanding programs in education, research and patient care in Neurology are a worthy common objective, UT Memphis and the SMC dedicate themselves jointly to pursue excellence in the development of a joint COM-SMC Department of Neurology through a cooperative initiative.

alleging affirmative defenses. On November 6, 2003, in the case of *David Prewitt v. State of Tennessee* (Claim No. 20-300-854), the Claims Commission granted Mr. Prewitt's motion for partial summary judgment regarding the liability of the State, which the State did not contest.

Plaintiff filed a motion for summary judgment with the circuit court as to Kindred and Nurse Glover on October 20, 2005. Plaintiff also filed for summary judgment as to Semmes-Murphey, and on December 14, Plaintiff filed a motion requesting an order that immunity should not apply to Semmes-Murphey.

On October 28, 2005, the trial court entered an order consolidating the Claims Commission case, *Prewitt v. State of Tennessee* (docket number CT-004086-05), with the circuit court action. On November 18, 2005, the trial court entered a scheduling order by consent of the parties that all written and factual discovery be completed and filed by January 15, 2006, that all experts were to be identified and their interrogatories provided by January 31, and that any expert that Plaintiff intended to use at trial be deposed by February 28. In December of 2005, Plaintiff designated his own expert witnesses as Eric Toloza, M.D., Ph.D., of Duke University Medical Center, and Dan Smith, M.D., of Emory University School of Medicine, both of whom were Board-certified specialists in surgery and experts in laparosurgery, trauma surgery, and general surgery. At the depositions for these two experts, Plaintiff's counsel expressly stated that he did not intend to rely upon either of these witnesses at trial to establish the standard of care or breach of such standard, but rather, only to establish causation of the injuries from Plaintiff's fall. Plaintiff filed a supplemental disclosure in January of 2006, stating that he intended to present the depositions of Dr. Muhlbauer, Dr. Timmons, Dr. Scrantz, Nurse Glover, and Nurse Avant at trial. In this document, Plaintiff did not express any indication that these parties were to be relied upon as expert witnesses.

On January 11, 2006, Semmes-Murphey filed a motion for summary judgment, citing Plaintiff's alleged failure to present any competent expert prepared to testify in support of the negligent supervision claim, and further alleging that Dr. Timmons and Dr. Muhlbauer were immune from suit according to their general supervisory authority over Dr. Scrantz as faculty for the UT residency program. These motions were argued before the Honorable Karen R. Williams in the Shelby County Circuit Court on February 2, 2006. At the summary judgment hearing in the circuit court, Plaintiff's counsel argued in support of Semmes-Murphey's liability in two alternative respects: "for direct liability in failing to supervise the resident on June the 21st, 2002; and, secondly, for vicarious liability because Semmes-Murphey had the right and duty to control its agent, the UT resident, Dr. Scrantz." In support of the first claim, Plaintiff cited our decision in ***Hayden v. Waller***, No. 02A01-9511-BC-00241, 1996 Tenn. App. LEXIS 867 (Tenn. Ct. App. Dec. 31, 1996), in an attempt to bolster the contention that immunity did not apply to Drs. Timmons and Muhlbauer. As to Kindred and Nurse Glover, Plaintiff argued that Nurse Glover's negligence "in failing to respond to the doctor's written order on the date of the incident, caused the first domino to fall in this case and caused the chain of events which led to the patient's fall and his injury."

By correspondence to the parties on March 3, 2006, the trial court announced its ruling as follows:

1. **Plaintiff's Motion for Summary Judgment against the Kindred Healthcare Defendants and Marcia Glover, R.N.**

   The Motion is denied. There is no expert proof indicating that Nurse Glover failed to do her duty to bring the [lumbar puncture] tray to the patient's bedside. She was not permitted to examine the contents of the tray as it was sterile. She had no knowledge that this tray did not contain the antiseptic Betadine. Further, even if she were negligent in not supplying an antiseptic, this was not the cause of plaintiff's fall. Dr. Scrantz failed to identify himself or check in with the nurses when he came to the floor and then to Plaintiff's room. Upon finding that there was no antiseptic, he could have called for a nurse to assist him but he did not. He could have called for help from the senior resident or a supervising doctor but he did not. When Dr. Scrantz decided to get the antiseptic himself, he failed to raise the bed rails. These intervening actions were the cause of Plaintiff's tragic fall.

2. **Plaintiff's Motion for an Order that Claims Commission Immunity Does Not Apply to the Defendant, Semmes-Murphey**
   **Plaintiff's Motion for Summary Judgment Against the Semmes-Murphey Defendants**
   **Defendant[']s Motion for Summary Judgment on Behalf of Defendant Semmes-Murphey**

   These three motions are all related. There are material facts at issue relating to the relationship of Semmes-Murphey and the UT residency program and whether Dr. Scrantz was being properly supervised on June 21, 2002.

   The case of *Hayden v. Waller*, 1996 Tenn. App. LEXIS 867, Tenn. App. No. 02A01-9511-BC-00241 (December 31, 1996) is distinguishable because in

-5-

> *Hayden* the doctor actually treated the patient on the day of the injury. In the case at bar, neither Dr. Timmons nor Dr. Muhlbauer treated Plaintiff on June 21, 2002. Thus, there can be no claim for direct negligence against Semmes-Murphey.
>
> The claim of negligence against the joint UT/Semmes-Murphey residency program based on the failure of Drs. Simmons [sic] and Muhlbauer to appropriately supervise Dr. Scrantz is still at issue. The Claims Commission Immunity covers Semmes-Murphey when they were performing their duties for the [College of Medicine/Semmes-Murphey Clinic] Department of Neurosurgery.

On March 10, the trial court entered an order effectuating this ruling and dismissing Semmes-Murphey from the proceeding originally filed in the circuit court. The order stated that "[i]ssues concerning the duties of Semmes-Murphey physicians in their capacity as members of the staff of the University of Tennessee for resident supervision remain at issue to be resolved in the case originally filed in the Tennessee Claims Commission, CT004086-05."

Also on March 10, the trial court held a hearing on Plaintiff's motion for clarification of the court's order. Regarding the trial court's findings related to Plaintiff's motion for summary judgment against Kindred and Nurse Glover, which had been denied based upon Plaintiff's failure to present expert proof of the standard of care and its breach by Nurse Glover, as well as the actions of Dr. Scrantz being an intervening cause of Plaintiff's injury, Plaintiff's counsel stated as follows:

> Your Honor, first of all, let me state for the record that I am not suggesting to the Court that I'm in favor of summary judgment in favor of the Kindred defendants. What I'm saying is, if that is the inevitable – if the Court has decided that Kindred is entitled to summary judgment, then what I would like to do is package this along with Semmes-Murphey to the Western section and let them address the issue as well as long as we're going there anyway, as long as the Court stays the proceeding below until we get resolution as to these other issues, but by no means am I stating that I think Kindred is entitled to summary judgment.

At that point in the proceedings, the trial court made clear that Kindred and Nurse Glover would be granted summary judgment as well, and she instructed the parties to ensure that the record was "cleaned up" in anticipation of our review. Kindred and Nurse Glover filed a motion for summary judgment on March 21, and on March 28, the trial court entered an order granting the motion.

Plaintiff filed a timely notice of appeal to this Court as to Kindred and Nurse Glover on March 28. On March 31, 2006, the trial court entered an order staying further proceedings against the State of Tennessee and The Med, neither of whom are involved in this appeal, pending our decision. The trial court entered an amended order granting summary judgment as a final order as to Semmes-Murphey on April 11, and Plaintiff supplemented his notice of appeal to include these defendants on April 18.

## II. ISSUES PRESENTED

On appeal, Appellant presents the following issues for our review:

1.      Whether the trial court erred in granting Semmes-Murphey's motion for summary judgment, on the basis of immunity under the Claims Commission Act, and in denying Plaintiff's motion that Semmes-Murphey should not be entitled to immunity.
2.      Whether the trial court erred in denying Plaintiff's motion for summary judgment as to liability against Semmes-Murphey.
3.      Whether the trial court erred in granting Kindred's motion for summary judgment, by dismissing Kindred and its employee, Nurse Glover.
4.      Whether the trial court erred in denying Plaintiff's motion for summary judgment as to liability against Kindred and Nurse Glover.

For the following reasons, we affirm the judgment of the circuit court.

## III. STANDARD OF REVIEW

According to the Tennessee Rules of Civil Procedure, summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04 (2006). "The cases construing Tenn. R. Civ. P. 56 make clear that the summary judgment process is designed to provide a quick, inexpensive means of concluding cases, in whole or in part, upon issues as to which there is no genuine dispute regarding material facts." *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993). "[S]ummary judgment is not a disfavored procedural shortcut but rather an important vehicle for concluding cases that can and should be resolved on legal issues alone." *Id.*

The party moving for summary judgment must affirmatively negate an essential element of the nonmoving party's claim, or conclusively establish an affirmative defense. *Patterson v. Arif*, 173 S.W.3d 8, 11 (Tenn. Ct. App. 2005) (citing *McCarley v. West Quality Food Serv.*, 960 S.W.2d 585 (Tenn. 1998)). In determining whether or not a genuine issue of material fact exists for purposes of summary judgment, courts in this state have indicated that the trial court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *Byrd*, 847 S.W.2d at 210-11. "Once it

is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial." *Id.* at 211. Summary judgment should be granted only when the facts and conclusions to be drawn from the facts permit a reasonable person to reach but one conclusion. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002). The standard of review for a trial court's grant of summary judgment is *de novo*, according no presumption of correctness to the trial court's determination. *Id.*

## IV. DISCUSSION

### A. Summary Judgment as to Liability of Semmes-Murphey

Appellant first contends that the trial court misapplied our decision in *Hayden v. Waller* when it determined that Dr. Timmons and Dr. Muhlbauer were entitled to Claims Commission immunity as to Plaintiff's claim for negligent supervision of the UT resident, Dr. Scrantz. Semmes-Murphey, conversely, maintains that there remains no genuine, material fact dispute regarding the nature of these physicians' actions or omissions on June 21, 2002, and that on this date Drs. Timmons and Muhlbauer never acted beyond the scope of their employment as UT Clinical Assistant Professors.

Tenn. Code Ann. § 9-8-307(h) expressly provides immunity for state employees acting within the scope of their employment. *Hayden v. Waller*, No. 02A01-9511-BC-00241, 1996 Tenn. App. LEXIS 867, at *11 (Tenn. Ct. App. Dec. 31, 1996). That section provides, in relevant part: "State officers and employees are absolutely immune from liability for acts or omissions within the scope of the officer's or employee's office or employment, except for willful, malicious or criminal acts or omissions or for acts or omissions done for personal gain. . . ." Tenn. Code Ann. § 9-8-307(h) (Supp. 2006). "Claims alleging professional malpractice by a [s]tate employee are within the jurisdiction of the Claims Commission. T.C.A. § 9-8-307(a)(1)(D). However, the Act expressly excludes from Claims Commission coverage those 'acts done for personal gain.' T.C.A. § 9-8-307(d)." *Hayden*, 1996 Tenn. App. LEXIS 867, at *11. Tenn. Code Ann. § 9-8-307(h) does not extinguish a claimant's right of action but merely immunizes state employees from individual monetary liability. *Shelburne v. Frontier Health*, 126 S.W.3d 838, 845 (Tenn. 2003) (citing *Johnson v. LeBonheur Children's Med. Ctr.*, 74 S.W.3d 338, 345-46 (Tenn. 2002)). "[I]n the Claims Commission there can be no individual liability or punitive damages and there is a $ 300,000 statutory damages cap; however, in the Circuit Court, individual liability can be imposed, punitive damages are recoverable and there is no cap on potential liability." *Hayden*, 1996 Tenn. App. LEXIS 867, at *9.

In *Hayden*, the defendant physician was a dual employee of both a private medical group and the UT Emergency Medicine Residency Program. *Hayden*, 1996 Tenn. App. LEXIS 867, at *4. The defendant received approximately 24% of his income from the university, and the remaining 76% was paid by the private medical group. *Id.* at *5. The defendant's duties as a member of the university faculty included the supervision and teaching of medical residents and medical students who were rotating through The Med. *Id.* at *3. When the defendant physician provided direct care

-8-

to patients, the private medical group had the exclusive right to bill for these services. *Id.* at \*6-7.

On October 30, 1992, the plaintiff patient in *Hayden* was treated for acute exacerbation of asthma at The Med's Emergency Department. *Id.* at 7. The defendant physician assessed the plaintiff's condition and assigned her care to a resident. *Id.* While treating another patient, the defendant was notified that the plaintiff's situation had become critical, and that the resident required assistance. *Id.* The defendant then rendered "direct, 'hands on' care" to the plaintiff, including the insertion of a laryngoscope and ordering X-rays and blood studies. *Id.* at \*8. The plaintiff died on that same day. *Id.* The plaintiff had been to The Med for treatment on two prior occasions that month, and the private medical group had billed for the earlier services that it had provided. *Id.* The private medical group admitted that it was entitled to bill for the defendant physician's services to the plaintiff, and in fact, it did bill for radiological treatment provided on the day that she died. *Id.* The plaintiff's husband filed one complaint against the defendant physician and private medical group in the circuit court, and another in the Claims Commission against the defendant physician and the UT resident as state employees. *Id.* at \*8. The circuit court proceedings were stayed pending the Claims Commission's determination of the physician's status. *Id.* at \*9. The Claims Commission entered an order finding that the defendant physician was not acting in his capacity as a state employee when he treated the plaintiff, but that he performed this treatment as an employee of the private medical group. *Id.* at \*10. Thus, the Claims Commission found immunity did not apply to the physician, and it was without jurisdiction to hear the claims against him. *Id.* The defendant physician appealed to this Court. *Id.*

On appeal, our inquiry was whether "the Claims Commission correctly determined that [the defendant] was acting within the scope of employment with his private practice group, . . . and not within the scope of employment with the University of Tennessee, in the care and treatment of [the plaintiff] at The Med on October 30, 1992." *Id.* In our analysis of this issue, we focused on whether the private medical group could be said to have extracted personal gain from the treatment provided to the plaintiff on the date in question. *Id.* at \*12-21. Particularly relevant to our determination in this regard was the ability of the private medical group to bill the plaintiff for the allegedly negligent treatment. *Id.* We looked to Medicare requirements, as well as the existing billing policy of the University for treatment of patients through this particular residency program. *Id.* at \*17. The defendant physician did not dispute that he had provided direct care to the plaintiff in response to the resident's request for assistance, nor did he controvert the fact that the private group was entitled to bill, and did in fact bill, for services rendered to the plaintiff on that date. *Id.* at \*17-18. In affirming the Claims Commission's determination, we stated:

> Dr. Hayden was a dual employee of both the University and of the Medical Group. When he worked in the emergency department at The Med, he did so as an employee of both the University and of the Medical Group. At The Med, Dr. Hayden served the University by supervising medical students and residents such as Dr. Duncan, and he served the Medical Group by rendering direct patient care to patients such as Mrs. Waller. The University did not employ Dr.

-9-

Hayden to perform direct patient care services at The Med; That was the Medical Group's obligation. For treating patients such as Mrs. Waller, the Medical Group paid Dr. Hayden in excess of $ 80,000 annually, which is clearly a personal gain to him.

It is not his service to the University that affords him absolute immunity in this case. Rather, it is his service to the Medical Group which removes the shield of absolute immunity.

*Id.* at 21-22.

Appellant argues that the trial court erred in finding that sovereign immunity applied to Drs. Timmons and Muhlbauer, and in ultimately granting Semmes-Murphey summary judgment. Plaintiff urges that evidence in the record demonstrates that at the times relevant to his cause of action, Drs. Timmons and Muhlbauer were acting as private practice physicians of Semmes-Murphey, rather than as agents of UT. Appellant asserts several facts in support of this position, including, that when Mr. Prewitt was initially admitted at The Med and treated for spinal injuries from the car accident, he was billed $29,182 for surgery and follow-up treatments allegedly performed by these physicians, that Semmes-Murphey sometimes billed patients for treatment occurring when their physicians supervised residents, and that Dr. Timmons and Dr. Muhlbauer received 100% of their income from Semmes-Murphey. Appellant correctly cites *Hayden* for the proposition that if the dual employee physicians might have billed for the services provided to him, then these physicians are not entitled to immunity for these services.

The depositions of Dr. Scrantz, Dr. Timmons, Dr. Muhlbauer, and Nurse Glover were heavily relied upon by all the parties throughout this case. Dr. Muhlbauer testified at his deposition that he performed the initial spinal surgery on Plaintiff in May of 2002, after he had presented to The Med because of his car accident in April of 2002. The record indicates that Semmes-Murphey did bill Plaintiff $29,182 for this surgery and certain followup care, and the final date of treatment reflected on that bill was May 22, 2002. Semmes-Murphey did not bill Plaintiff for the lumbar puncture procedure conducted on June 17, or the attempted procedure by Dr. Scrantz on June 21, 2002.

It is undisputed that neither Dr. Timmons or Dr. Muhlbauer was present at the attempted lumbar puncture procedure by the UT resident, Dr. Scrantz, on June 21. Both Dr. Timmons and Dr. Muhlbauer testified in deposition that they did not directly supervise Dr. Scrantz on that date, but that they were responsible for his general supervision in their role as UT faculty members. Dr. Timmons stated that he "didn't think anybody was responsible for directly supervising [Dr. Scrantz] that day because he was doing things that were in keeping with his level of experience and expertise and didn't require direct supervision that day."

*Hayden* involved treatment in which the dual employee physician defendant, along with a resident physician, had provided direct care to the plaintiff's decedent. Conversely, there is nothing

in the record before us to suggest that the dual employee physicians were present on the day in question, or that they had directed Dr. Scrantz to perform the second lumbar puncture procedure. Dr. Scrantz stated in his deposition that he wrote the order for a lumbar puncture kit on the morning of June 21, 2002. Dr. Scrantz testified that he was not directly supervised by any physician during this attempted procedure, but he recalled that a senior UT resident, Dr. Banergee, had directly supervised the first lumbar puncture four days earlier, on June 17th. Although there are several record entries in Plaintiff's chart from various healthcare providers between June 17–22, none of the parties were able to identify a Semmes-Murphey physician who was directly present for either of these procedures, although Dr. Scrantz stated that Dr. Muhlbauer was making rounds on June 17th.

Drs. Timmons and Muhlbauer were dual employees of the UT Department of Neurosurgery Residency Program and Semmes-Muprhey. As in *Hayden*, in order for Semmes-Murphey to be able to bill for treatment of patients through the joint program, they had to fulfill certain Medicare requirements. The relevant Medicare statute provides, in relevant part:

> (a) General rule. If a resident participates in a service furnished in a teaching setting, physician fee schedule payment is made *only if a teaching physician is present during the key portion of any service or procedure for which payment is sought.*
> (1) In the case of surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure.
> (i) In the case of surgery, the teaching physician's presence is not required during opening and closing of the surgical field.
> (ii) In the case of procedures performed through an endoscope, the teaching physician must be present during the entire viewing.
> (2) *In the case of evaluation and management services, the teaching physician must be present during the portion of the service that determines the level of service billed.* (However, in the case of evaluation and management services furnished in hospital outpatient departments and certain other ambulatory settings, the requirements of § 415.174 apply.)
> (b) Documentation. Except for services furnished as set forth in §§ 415.174 (concerning an exception for services furnished in hospital outpatient and certain other ambulatory settings), 415.176 (concerning renal dialysis services), and 415.184 (concerning psychiatric services), the medical records must document the teaching physician was present at the time the service is furnished. The presence of the teaching physician during procedures may be

demonstrated by the notes in the medical records made by a physician, resident, or nurse. In the case of evaluation and management procedures, the teaching physician must personally document his or her participation in the service in the medical records.

. . . .

42 C.F.R. § 415.172 (Supp. 2007) (emphasis added). Dr. Timmons's described the billing practice as follows:

> Q.      How are you able to bill for your supervisory responsibilities at The Med in a case such as this?
> A.      Any care – any direct patient care that I render to the patient without the involvement of a resident, I would submit a bill for. Any care that I directly supervise with the resident, I would submit a bill for.
>          So if I'm present with them while the procedure or a visit is going on, I would be able to submit a bill for that with the proper participation on my part and proper documentation on my part.
> Q.      Is that something that Medicare requires you to do?
> A.      Yes.
> Q.      You have to be present to be able to bill?
> A.      Yes, that's right.

Similarly in response to questioning at his deposition in this regard, Dr. Muhlbauer stated as follows:

> Q.      Did you bill for the lumbar puncture that was performed on June 21?
> A.      I can't. I wasn't there.
> Q.      And in fact, you would not be able to bill for a procedure that you were not present for and supervising according to Medicare guidelines; is that correct?
> A.      Correct.

The parties do not appear to dispute that these Medicare guidelines dictated Semmes-Murphey's ability to bill for treatment of patients through the UT/Semmes-Murphey Department of Neurosurgery Residency Program.[4]

---

[4] Appellant contends that in *Hayden*, we held that in order for a dual employee to be entitled to immunity under Tenn. Code Ann. § 9-8-307(h), the two prerequisites were that there be a prior agreement that the faculty doctor
(continued...)

-12-

Appellant places considerable emphasis on a record entry reflected in his medical chart for June 17, 2002, the date of the successful lumbar puncture, to bolster his assertion that Semmes-Murphey staff was present for this procedure and even ordered the repeat of this procedure on June 21. The entry, which is included in the record as an exhibit to Nurse Glover's deposition, is practically unreadable, although the legible portion reads, "NS Staff Present for LP . . . If repeat LP . . . will require . . . ." followed by an unidentifiable signature that begins with the letter "M." Above this entry on the same date, a separate signed entry indicates the presence of a Dr. Banergee for this first procedure. Appellant contends that the former entry indicates the presence of a Semmes-Murphey physician for the June 17 procedure, and that Semmes-Murphey therefore ordered the repeat procedure attempted by Dr. Scrantz on June 21, as part of its continuing "follow-up" treatment stemming from Plaintiff's initial spinal surgery the previous month. Appellant contends that this indicates that Semmes-Murphey was, therefore, entitled to bill for the procedure attempted on June 21 and central to the litigation, and consequently its dual employee physicians were not entitled to immunity for this treatment.

We believe Appellant's argument is contradicted by undisputed facts within the record. Dr. Scrantz stated in his deposition that he performed the first lumbar puncture under the supervision of Dr. Banergee, a senior UT resident. While he also stated that Dr. Muhlbauer had been making rounds that day, there is nothing in the record to support Appellant's contention that a member of Semmes-Murphey staff was present to provide direct supervision for either procedure. Dr. Scrantz's deposition testimony further indicates that he alone scheduled the second lumbar puncture procedure, that he wrote the order for the lumbar puncture kit on the morning of June 21, and that no Semmes-Murphey physician ever signed this order.

Even if we were to determine that the entry signed "M" by a Neurosurgery staff member on June 17 manifests the presence of Dr. Muhlbauer for this first successful procedure, we do not believe that this is the appropriate date by which to determine whether Semmes-Murphey might have billed for the care involved in this litigation. Instead, June 21, 2002, is, in our opinion, the determinative date of treatment in consideration of Medicare's billing requirements. That is the date on which Dr. Scrantz lowered Plaintiff's bed rail and left him unattended, leading to Plaintiff's injury. It is undisputed that neither Semmes-Murphey physician was present directly supervising the resident on this date, and accordingly Semmes-Murphey could not have billed for this attempted procedure.

In further support of excluding Semmes-Murphey from immunity, Appellant emphasizes the importance of the fact that Drs. Timmons and Muhlbauer received 100% of their salary from

---

[4](...continued)
would not bill for a patient's care and a transfer of that faculty doctor's right to bill to the University. Appellant cites the absence of any such agreement in support of his argument that Semmes-Murphey is not entitled to immunity. We disagree with this reading of *Hayden*. In applying the relevant factors in that case, we determined that when the plaintiff patient was treated in 1992, *university policy at that time* required these criteria to be met before a dual employee physician could be deemed to have immunity. ***Hayden***, 1996 Tenn. App. LEXIS 867, at *18-19. Appellant has cited nothing in the record before us to suggest that such a policy was in effect in 2002, ten years later.

Semmes-Murphey. In **Hayden**, 1996 Tenn. App. LEXIS 867, at *21, we stated that "so long as the physician is receiving payment from an employer other than the State of Tennessee to perform the work in question, he is not entitled to immunity." However, in this case, the depositions of both physicians reveal that they did receive a salary as faculty resident supervisors from UT indirectly, which UT paid to Semmes-Murphey. Semmes-Murphey, in turn, issued this total amount to the dual employees. Although we did note that the salary arrangement may be relevant in determining a dual employee's immunity status in *Hayden*, as explained above, the ability to bill the patient for care provided is the most conclusive factor for such an analysis. In this case, there is no evidence in the record that either Dr. Timmons or Muhlbauer could have billed for the procedure attempted by Dr. Scrantz on June 21, 2002, or that they received payment from Semmes-Murphey for any work performed on this date.

In light of *Hayden*, we focus on the trial court's determination that Dr. Timmons and Dr. Muhlbauer were acting in their roles as faculty supervisors for UT resident physicians on June 21, 2002, rather than as private physicians through Semmes-Murphey. We find no error in this determination, and find that immunity applied to Drs. Timmons and Muhlbauer for any allegedly negligent acts or omissions on that date.

Plaintiff argues alternatively that even if this Court finds these two doctors to be immune through their affiliation with the UT residency program, Semmes-Murphey may still be held vicariously liable for the negligent conduct of the resident, Dr. Scrantz, applying the principles set forth in *Johnson v. LeBonheur Children's Med. Ctr.* and *Shelburne v. Frontier Health*. In **Johnson v. LeBonheur Children's Med. Ctr.**, 74 S.W.3d 338, 345-46 (Tenn. 2002), the Tennessee Supreme Court held that even if a state-employed physician resident were entitled to immunity for treatment of a patient, if that resident acted as an agent of a private hospital and certain legal criteria were absent, the private hospital could still be held vicariously liable. In **Shelburne v. Frontier Health**, 126 S.W.3d 838 (Tenn. 2003), the Court reaffirmed this principle by holding that a private healthcare provider could be held liable for the acts of its agent, a state-employed social worker, even if that agent was individually immune from suit.

"Generally, whether an employee is acting within the scope of his or her employment is a question of fact. . . . However, it becomes a question of law when the facts are undisputed and cannot support conflicting resolutions." **Tennessee Farmers Mut. Ins. Co. v. American Mut. Liability Ins. Co.**, 840 S.W.2d 933, 937 (Tenn. Ct. App. 1992) (citations omitted). Dr. Scrantz testified at deposition that he was an employee of UT via his residency. Appellant has cited no facts within the record that would support the conclusion that Dr. Scrantz was acting as an actual or apparent agent of Semmes-Murphey on June 21, 2002. A court should award summary judgment only when a reasonable person could reach only one conclusion based on the facts and the inferences drawn from those facts. **Patterson v. Arif**, 173 S.W.3d 8, 11 (Tenn. Ct. App. 2005). Upon review of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" within the record, we find no material fact in dispute that would support a conclusion that Dr. Scrantz was acting in any other capacity than as an employee of the State when he attempted to perform the lumbar puncture procedure upon Mr. Prewitt on June 21, 2002. Considering this

evidence, along with the undisputed fact that neither Dr. Timmons or Dr. Muhlbauer was present to directly supervise the resident on June 21, we have determined that Dr. Scrantz was not acting on the behalf of Semmes-Murphey on this date. Because we have determined as a matter of law that Dr. Scrantz, the UT resident, was not acting as an agent of Semmes-Murphey when performing the acts in question, we hold the *Johnson* and *Shelburne* decisions to be inapplicable to the case at bar.

We find that any acts or omissions alleged in Plaintiff's claim for negligent supervision against Semmes-Murphey through its employees, Dr. Timmons and Dr. Muhlbauer, were solely within the scope of these employees' duties as supervisors for the University of Tennessee Department of Neurosurgery Residency Program. We further hold as a matter of law that the UT resident, Dr. Kelly Scrantz, did not act as an agent of Semmes-Murphey on June 21, 2002, and therefore Semmes-Murphey may not be held vicariously liable for any negligence attributable to him on that date. We find no error, therefore, in the trial court's decision to grant summary judgment to Semmes-Murphey on the issue of liability. Plaintiff's remaining issue as to his own motion for summary judgment against Semmes-Murphey regarding liability is pretermitted.

### B. Summary Judgment as to Liability of Kindred

Appellant further alleges that the trial court erred in granting summary judgment to Kindred and its employee, Nurse Marcia Glover. Mr. Prewitt contends that the applicable standard of care required Nurse Glover to retrieve Betadine in response to Dr. Scrantz's order for a lumbar puncture kit, and that her failure to provide this antiseptic prior to the procedure was a proximate cause of Plaintiff's subsequent injury. Appellant alternatively argues that Nurse Glover's absence from his bedside at the outset of the attempted lumbar puncture procedure constituted a negligent omission. Appellant maintains that these omissions constituted an act of ordinary negligence, rather than medical malpractice, and therefore no expert testimony was necessary. Nonetheless, Appellant argues that even if we find this claim to sound in medical malpractice, he satisfied the expert testimony requirement of the Tennessee Medical Malpractice Act, Tenn. Code Ann. § 29-26-115 *et seq.*, through Nurse Glover and Nurse Avant's responses to Plaintiff's questions, regarding the applicable standard of care, at their depositions.

The Tennessee Supreme Court has articulated a test for differentiating between common law negligence and medical malpractice claims:

> In distinguishing between the two claims, it should be noted that not all cases involving health or medical entities sound in medical malpractice. . . At the other end of the spectrum, the medical malpractice statute may extend to acts of non-physicians, such as nurses, when they are involved in the medical treatment of a patient. . . [W]hen a claim alleges negligent conduct which constitutes or bears a substantial relationship to the rendition of medical treatment by a medical professional, the medical malpractice statute is

applicable. Conversely, when the conduct alleged is not substantially related to the rendition of medical treatment by a medical professional, the medical malpractice statute does not apply.

*Gunter v. Lab. Corp. of Am.*, 121 S.W.3d 636, 640-41 (Tenn. 2003) (citations omitted). This Court has stated that the distinction between common law negligence and medical malpractice depends on "whether the acts or omissions complained of involve a matter of medical science or art requiring specialized skills not ordinarily possessed by lay persons or whether the conduct complained of can instead be assessed on the basis of common everyday experience of the trier of fact." *Graniger v. Methodist Hosp. Healthcare Sys.*, No. 02A01-9309-CV-00201, 1994 Tenn. App. LEXIS 513, at *8 (Tenn. Ct. App. Sept. 9, 1994).

When the medical malpractice statute applies, it provides in relevant part:

(a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection (b) when it determines that the appropriate witnesses otherwise would not be available.

Tenn. Code Ann. § 29-26-115 (Supp. 2006). More simply, in a medical malpractice action, the plaintiff has the burden of proof on the following elements: standard of care, breach of the standard of care, and causation. *Payne v. Shumake*, No. 02A01-9901-CV-00006, 1999 Tenn. App. LEXIS 846, at *8 (Tenn. Ct. App. Dec. 15, 1999). In order to establish each of these elements, the plaintiff must put forth expert evidence, unless the allegedly negligent act lies within the common knowledge of the layman. *Id.* (citing *Bowman v. Henard*, 547 S.W2d 527, 530-32 (Tenn. 1977); *Ayers v. Rutherford Hosp., Inc.*, 689 S.W.2d 155, 160 (Tenn. Ct. App. 1984)).

"Where the act of alleged malpractice lies within the common knowledge of a layman, expert testimony is not required." *Baldwin v. Knight*, 569 S.W.2d 450, 456 (Tenn. 1978) (citing *Bowman v. Henard*, 547 S.W.2d 527 (Tenn.1977); *Rural Educ. Ass'n. v. Bush*, 42 Tenn. App. 34, 298 S.W.2d 761 (1956)). This common knowledge exception applies to cases in which the medical negligence is as blatant as a "fly floating in a bowl of buttermilk" so that all mankind knows that such things are not done absent negligence. *Graniger*, 1994 Tenn. App. LEXIS 513, at *9.

Any allegedly negligent acts or omissions by Nurse Glover regarding Mr. Prewitt's treatment on June 21, 2002 undoubtedly bore a substantial relationship to the rendition of medical treatment by a medical professional. We are unconvinced by Appellant's argument that Nurse Glover's failure to include Betadine in the lumbar puncture kit or her absence from Plaintiff's bedside immediately prior to the attempted procedure constituted a negligent act within the common knowledge of a layperson, therefore, we find that Plaintiff was required to satisfy the expert testimony requirements of Tenn. Code Ann. § 29-26-115.

In her affidavit, Nurse Glover stated that at all times pertinent to the litigation, she was an employee of Kindred and that her conduct "exceeded the recognized standard of acceptable professional practice in this locale and community in the care and treatment of Mr. Prewitt." At her deposition, Nurse Glover stated that she read Dr. Scrantz's order for a lumbar puncture kit and followed it as written by taking a sealed, sterile lumbar puncture kit to Mr. Prewitt's bedside. Nurse Glover represented that, as the assigned registered nurse for Plaintiff, she checked his condition regularly and always ensured that his bed rails were in the upright position. She stated that before Dr. Scrantz had entered Plaintiff's room on June 21, 2002, Dr. Scrantz did not notify her that he would be treating Plaintiff at that time. Nurse Glover claimed to have first noticed Dr. Scrantz's presence when he was leaving Plaintiff's room to obtain Betadine. She stated that as Dr. Scrantz walked toward the supply closet, she had proceeded toward Plaintiff's room when she heard a loud noise, after which she ran toward Plaintiff's room and found him lying face down on the floor. Nurse Glover stated that upon entering the room and noticing Plaintiff's condition, she also noticed that his bed rails had been lowered, and that when Dr. Scrantz returned to the room, he informed her that he had left the bed rails down when he left the room. Dr. Scrantz, in his deposition, stated that he did not specify Betadine in his written order for a lumbar puncture kit, and that nurses "usually follow the orders very specifically."

As noted above, Plaintiff did not rely on his own experts' opinions in attempting to establish the standard of care or its breach for nurse practitioners assisting in lumbar puncture procedures, but

-17-

instead attempted to establish this standard of care through his questioning of Nurses Glover and Avant at deposition with regard to certain internal documents of The Med or Kindred. When questioning these nurses in the 2004 depositions, for instance, Plaintiff's counsel repeatedly relied upon a document entitled "The Regional Medical Center at Memphis – Bronchoscopy, Endoscopy, Lumbar Puncture – Assistance." (Ex. 2, Dep. of Glover). The first item of that document provided, "1. Washes hands. Gathers required equipment and supplies." At deposition, Nurse Glover was questioned as follows regarding this document:

> Q.      Besides Dr. Scrantz[' s deposition] and the medical records, have you reviewed anything else pertaining to this patient, this case, or this incident such as any hospital policies?
> A.      Yes.
> Q.      The lumbar puncture policy; right?
> A.      Specific – it was lumbar puncture, bronchoscopies and other procedures.
> Q.      One page; right?
> A.      Yes.
> Q.      And you reviewed that sheet in response to this litigation but not prior thereto; right?
> A.      That's correct.
> . . .
> Q.      As of the date of David Prewitt's lumbar punctures, plural, in June of 2002, you hadn't seen that policy, had you?
> A.      No.
> Q.      You weren't aware of it, were you?
> A.      No.
> Q.      If you were aware of it, you would have followed it, wouldn't you?
> A.      Yes, and to the best of my knowledge, I did follow what was on there.
> Q.      We'll get to that in just a minute.
> A.      Okay.
> Q.      Betadine is a supply, isn't it?
> A.      Yes.
> . . .
> Q.      The [lumbar puncture]/bronchoscopy policy that we just covered – the standard of care required you to follow that, didn't it?
> A.      Repeat that again.
> Q.      The standard of care as of June 2002 required you to follow that policy, didn't it?
> A.      Yes.

Similarly, in the deposition of Nurse Avant, Plaintiff's counsel repeatedly used the term "standard of care" while questioning the deponent, during exchanges in which it is clear that Nurse Avant was referring to standard of care manuals and internal policies of The Med, rather than the specifically defined "recognized standard of acceptable professional practice" as defined at Tenn. Code Ann. § 29-26-115 (Supp. 2006).

Undisputed statements made by Nurses Glover and Avant and others at deposition established that, depending on the particular hospital where they were located, lumbar puncture kits sometimes came prepackaged with Betadine. Nurse Glover testified that this had been the first lumbar puncture procedure in which she had participated in that particular unit at The Med. Nurse Glover further stated that the lumbar puncture kits were sterile and sealed, and that she was not allowed to open the kit to verify its contents before leaving it for Dr. Scrantz at Plaintiff's bedside.

At the summary judgment hearing on February 2, 2006, Plaintiff's counsel stated that he intended to rely upon Nurse Glover and Nurse Avant's deposition testimony to establish the standard of care according to Tenn. Code Ann. § 29-26-115:

> So the standard of care in this case is established by the hospital policy, the written contract, the testimony of the supervisor [Nurse Avant], and the testimony of Nurse Glover was that, in response to Dr. Scrantz's written order for the lumbar puncture kit, she was required to retrieve all supplies to the bedside prior to the procedure, including an antiseptic.

Causation and foreseeability issues aside, we believe Plaintiff's reliance upon this vague hospital policy and his questioning of Nurses Glover and Avant in its regard were not sufficient to satisfy the expert testimony requirements of the Tennessee Medical Malpractice Act regarding the applicable standard of care.

First, we note that other states have held that internal hospital policies, although possibly relevant when accompanying competent expert testimony, do not alone conclusively establish the standard of care for a medical procedure. *See, e.g.*, *Moyer v. Reynolds*, 780 So. 2d 205, 208 (Fla. Dist. Ct. App. 2001); *Pogge v. Hale*, 253 Ill. App. 3d 904, 915 (Ill. App. Ct. 1993); *Luettke v. St. Vincent Mercy Med. Ctr.*, No. L-05-1190, 2006 Ohio App. LEXIS 3828, at *12-13 (Ohio Ct. App. July 28, 2006); *Wuest v. McKennan Hosp.*, 2000 SD 151 (S.D. 2000); *Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 414 (Tex. App. 2003); *Riverside Hosp., Inc. v. Johnson,* 272 Va. 518, 529 (Va. 2006); *Auer v. Baker*, 63 Va. Cir. 596, 600 (Va. Cir. 2004); *Happersett v. Bird*, 222 Wis. 2d 624 (Wis. Ct. App. 1998).

Furthermore, we believe that the method by which Plaintiff attempted to extrapolate testimony establishing the standard of care, and the nature of questioning of Nurses Glover and Avant in this regard, failed to satisfy the expert proof requirements of Tenn. Code Ann. § 29-26-115

(Supp. 2006). Throughout his questioning of these nurses at their discovery depositions, despite later relying on this testimony as expert proof of the standard of care, Plaintiff's counsel did not ask either nurse to define the standard of professional practice for nurses assisting in lumbar puncture procedures in Memphis or similar communities, or to describe their own familiarity with such standard. Instead, questions posed to these deponents by Plaintiff's counsel regarding The Med's policies evince his own belief that these internal standards were equivalent to the relevant standard of professional practice. As a result, rather than allow Nurses Glover and Avant express their opinions, he effectively asked them to accede to his own characterization of the applicable standard of care.

Appellant argues that this Court's holding in *Mullins v. Jonas*, No. 02A01-9306-CV-00132, 1994 Tenn. App. LEXIS 456, at *11-12 (Tenn. Ct. App. Aug. 15, 1994), reflects a trend of Tennessee courts to relax the requirement of strict adherence to the statutory language of Tenn. Code Ann. § 29-26-115 by parties when questioning experts as to the relevant standard of accepted professional practice. We recognize, however, that in that decision, we found that the overall testimony of the expert physician conformed with the requirements of the Tennessee Medical Malpractice Act, and therefore we reversed the trial court's grant of directed verdict to the defendant. *Id.* After a thorough review of the entire record, we cannot say that the overall deposition testimony of Nurses Glover and Avant in this case satisfied these requirements.

Consequently, we find that Plaintiff did not provide competent expert proof that Nurse Glover's actions in providing a lumbar puncture kit prior to Plaintiff's procedure constituted a failure to act with reasonable or ordinary care in accordance with the professional standard of care as it is defined within the Tennessee Medical Malpractice Act, nor did Plaintiff offer sufficient expert proof that the applicable standard of care required Nurse Glover to be present when Dr. Scrantz initially entered Mr. Prewitt's room and prepared him for the lumbar puncture procedure. As a result, summary judgment was appropriate for Kindred and its employee, Nurse Glover. Finding the only remaining issue to be pretermitted, we similarly affirm the trial court's denial of Plaintiff's motion for summary judgment as to liability of Kindred and Nurse Glover.

## V. CONCLUSION

For the foregoing reasons, we affirm the trial court's grant of summary judgment as to Semmes-Murphey, Kindred, and Nurse Glover. We also affirm the trial court's denial of summary judgment to Appellant. Costs are assessed against Appellant, David Prewitt, and his surety, for which execution may issue, if necessary.

_____
ALAN E. HIGHERS, JUDGE

-20-